PEARSON, J.

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| ANGELA MANNING, | ) | |
| | ) | CASE NO.  1:20CV2734 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | JUDGE BENITA Y. PEARSON |
| | ) | |
| LAKE HOSPITAL SYSTEM, INC., | ) | **MEMORANDUM OF ORDER AND** |
| | ) | **OPINION** |
| Defendant. | ) | [Resolving ECF No. 31] |

Pending before the Court is Defendant's Motion for Summary Judgment.  ECF No. 31.

The motion has been fully briefed.  ECF Nos. 38, 39.  The Court has reviewed the filings,

exhibits, and applicable law.  For the reasons stated below, Defendant's motion is granted.

## I.  Background[1]

Plaintiff was employed by Defendant from July 8, 2018 through July 31, 2020 as an

Operating Room Circulating Nurse at the Lake West Medical Center ("Lake West") in

Willoughby, Ohio.  ECF No. 30 at PageID #: 414.  At the time Plaintiff applied to Defendant on

May 1, 2018, Plaintiff was employed as a nurse at Maxim Healthcare Services in Independence,

Ohio, being paid $24.00 per hour.  *Id*.  Previously, Plaintiff worked as a nurse at University

Hospitals Bedford Medical Center from February 2011 through September 2015, and when she

exited that role her hourly rate was $31.75 per hour.  *Id*.  Following Plaintiff's initial interview

with Defendant on May 24, 2018, Plaintiff accepted an offer of employment at the rate of $34.00

---

[1]  The background section is a recitation of uncontested facts submitted by the
parties.  ECF No. 30.

(1:20CV2734)

per hour, with $2.50 shift differentials, as applicable.  *Id*. at PageID #: 414 – 415.  Plaintiff

accepted the offer on June 22, 2018 and commenced employment with Defendant on July 8,

2018.  *Id*. at PageID #: 415.  At all times, Plaintiff's employment with Defendant was "at will."

*Id*.  At the time Plaintiff was hired, Circulating Nurses in the Lake West Operating Room were

paid between $29.53 and $38.75 per hour.  *Id*.  The Circulating Nurses employed in the Lake

West Operating Room at the time of Plaintiff's hire on July 8, 2018 were identified by name, rate

of pay, race, and sex, were:

| NAME | RATE OF PAY | RACE (SEX) |
|---|---|---|
| Circulating Nurse 1 | $29.53 | White (f) |
| Circulating Nurse 2 | $30.39 | White (m) |
| Circulating Nurse 3 | $31.03 | White (f) |
| Circulating Nurse 4 | $33.25 | White (f) |
| Manning, Angela E. | $34.00 | Black/African American (f) |
| Circulating Nurse 5 | $34.11 | White (f) |
| Circulating Nurse 6 | $35.67 | White (m) |
| Circulating Nurse 7 | $36.63 | Black/African American (f) |
| Circulating Nurse 8 | $36.63 | White (f) |
| Circulating Nurse 9 | $36.91 | White (f) |
| Circulating Nurse 10 | $37.06 | White (f) |
| Circulating Nurse 11 | $37.27 | White (f) |
| Circulating Nurse 12 | $37.34 | White (f) |
| Circulating Nurse 13 | $38.75 | White (f) |

(1:20CV2734)

*Id.*[2]

In November 2019, Plaintiff received a rating of "meets expectations" on her first annual performance review.  *Id.*  As a result, Plaintiff received a $0.68 per hour pay increase.  *Id.*  On June 25, 2020, Plaintiff had a discussion with Defendant's Vice President of Perioperative Services, Valerie Kovacic-Mauer ("Kovacic-Mauer"), in which Plaintiff complained that she was being paid less than white nurses because of her race.  *Id.*  On June 29, 2020, Plaintiff emailed Kovacic-Mauer an article titled, "This critical link could help bridge America's racial wealth gap."[3]  *Id.* at PageID #: 416.  On July 16, 2020, Nurse Shellie Byrne ("Byrne") made a written complaint about Plaintiff to Plaintiff's immediate supervisor, Nurse Manager Kimberli Cole ("Cole") and Kovacic-Mauer.  *Id.*  Defendant investigated Byrne's complaint.  *Id.*

Later in the day on July 16, 2020, Cole and Kovacic-Mauer received a second written complaint about Plaintiff from Nurse Facilitator Jessica O'Connor ("O'Connor").  *Id.*  On July 17, 2020, Surgical Technician LaToya Fields ("Fields") advised Kovacic-Mauer about a situation involving Plaintiff that had occurred in the Operating Room on July 9, 2020.  *Id.*  In response, Kovacic-Mauer requested and received a written statement from Fields.[4]  *Id.*  Plaintiff's employment with Defendant was terminated effective July 31, 2020.  *Id.*  At the time of Plaintiff's termination, Circulating Nurses in the Lake West Operating Room were paid

---

[2]  The chart above has been modified to remove the names of nonparty Circulating Nurses.  Counsel will be provided indices that include both the name and confidential designation of each Circulating Nurse.  *See* ECF No. 40.

[3]  The article is attached to the parties' uncontested facts.  ECF No. 30-1.

[4]  Fields' statement is attached to the parties' uncontested facts.  ECF No. 30-4.

3

(1:20CV2734)

between $31.81 and $39.44 per hour.  *Id*.  The Circulating Nurses employed in the Lake West

Operating Room at the time of Plaintiff's termination on July 31, 2020, identified by name, rate

of pay, race, and sex, were:

| NAME | RATE OF PAY | RACE (SEX) |
|---|---|---|
| Circulating Nurse 3 | $31.81 | White (f) |
| Manning, Angela E. | $34.68 | Black/African American (f) |
| Circulating Nurse 14 | $35.00 | White (f) |
| Circulating Nurse 8 | $37.36 | White (f) |
| Circulating Nurse 15 | $37.74 | White (f) |
| Circulating Nurse 10 | $37.80 | White (f) |
| Circulating Nurse 9 | $37.83 | White (f) |
| Circulating Nurse 12 | $38.27 | White (f) |
| Circulating Nurse 16 | $38.99 | White (f) |
| Circulating Nurse 17 | $39.44 | White (f) |

*Id*. at PageID #: 416 – 417.[5]  Defendant has moved for summary judgment on Plaintiff's three

claims: (1) race discrimination in violation of Title VII (42 U.S.C. § 2000e, *et seq*.), (2) race

discrimination, in violation of Ohio civil rights law (O.R.C. § 4112, *et seq*.), and (3) retaliation in

---

[5]  The chart above has been modified to remove the names of nonparty
Circulating Nurses.  Counsel will be provided indices that include both the name and
confidential designation of each Circulating Nurse.  *See* ECF No. 40.

4

(1:20CV2734)

violation of  Title VII (42 U.S.C. § 2000e, *et seq*.) and Ohio civil rights law (O.R.C. § 4112, *et seq*.).[6]

## II.  Discussion

"Summary judgment is appropriate where 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"  *Scola v. Publix Supermarkets, Inc.*, 557 F. App'x 458, 462 (6th Cir. 2014) (quoting Fed. R. Civ. P. 56(a)).  The fact under dispute must be "material," and the dispute itself must be "genuine."  A fact is "material" only if its resolution will affect the outcome of the lawsuit.  *Scott v. Harris*, 550 U.S. 372, 380 (2007).  In determining whether a factual issue is "genuine," the Court assesses whether the evidence is such that a reasonable jury could find that the non-moving party is entitled to a verdict.  *Id*.  ("[Summary judgment] will not lie . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.").  The moving party is not required to file affidavits or other similar materials negating a claim on which its opponent bears the burden of proof, so long as the movant relies upon the absence of an essential element in the pleadings, depositions, answers to interrogatories, and admissions on file.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

To survive summary judgment, the non-moving party "must 'do more than simply show that there is some metaphysical doubt as to the material facts.'"  *Baker v. City of Trenton*, 936 F.3d 523, 529 (6th Cir. 2019) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,

---

    [6]  The evidentiary standards for discrimination claims under either the federal anti-discrimination statute Title VII (42 U.S.C. § 2000e, *et seq*.) and the Ohio anti-discrimination statute (O.R.C. § 4112, *et seq*.) can be used interchangeably.  *See Wilson v. Ford Motor Co.*, 513 F. App'x 585, 588 (6th Cir. 2013); *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1020 n. 2 (6th Cir. 2000).

(1:20CV2734)

475 U.S. 574, 587 (1986)).  Once the movant makes a properly supported motion, the burden

shifts to the non-moving party to demonstrate the existence of a genuine dispute.  An opposing

party may not simply rely on its pleadings; rather, it must "produce evidence that results in a

conflict of material fact to be resolved" by a factfinder.  *Cox v. Ky. Dep't of Transp.*, 53 F.3d

146, 150 (6th Cir. 1995).  "The mere existence of a scintilla of evidence in support of the

plaintiff's position will be insufficient; there must be evidence on which the jury could

reasonably find for the plaintiff."  *Srouder v. Dana Light Axle Mfg., LLC*, 725 F.3d 608, 613 (6th

Cir. 2013) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).  In analyzing a

motion for summary judgment, the Court "must view the evidence in the light most favorable to

the nonmoving party."  *Lossia v. Flagstar Bancorp, Inc.*, 895 F.3d 423, 428 (6th Cir. 2018)

(citing *Latits v. Phillips*, 878 F.3d 541, 547 (6th Cir. 2017)).

Defendant argues summary judgment is appropriate because (1) Plaintiff "has not

produced any evidence that her room assignments were less favorable[,]" rather Plaintiff

"received more 'hallway' assignments than any other nurse in her department[,]" (2) Plaintiff

"was paid more than several white nurses in her department, including a white male nurse[,]"

and (3) even though other African-American and white nurses were paid more than Plaintiff, it

was because of "race-neutral factors including years of nursing experience, seniority …,

certifications obtained, advanced degrees held, scope of practice, and strong performance

reviews."  ECF No. 31-1 at PageID #: 452 – 453.  Defendant also articulates that Plaintiff's

termination was rooted in neutral, lawful reasons, and was not a pretextual reason because

Plaintiff's termination was based on three documented complaints management received about

Plaintiff's behavior.  Two of them ran afoul of its policy of zero-tolerance for any racially

divisive comments.  *Id.* at PageID #: 453.

6

(1:20CV2734)

In response, Plaintiff avers that summary judgment is not appropriate because (1) she was the lowest paid nurse at the time she was terminated from her employment (ECF No. 38 at PageID #: 904 – 907), and (2) the reasons for her termination were pretextual because (i) on at least one occasion, Defendant directed a co-worker to file a written complaint against Plaintiff, and (ii) employees outside Plaintiff's protected class were not terminated for making racially divisive comments (ECF No. 38 at PageID #: 910 – 911).

### A.  Prima Facie Racial Discrimination

To establish a claim of race discrimination, Plaintiff must first demonstrate a prima facie case of discrimination, which requires a showing that "(1) [Plaintiff] is a member of a protected group; (2) [Plaintiff] was subjected to an adverse employment decision; (3) [Plaintiff] was qualified for the position; and (4) similarly situated non-protected employees were treated more favorably." *Smith v. City of Toledo, Ohio*, 13 F.4th 508, 515 (6th Cir. 2021) (quoting *Jackson v. VHS Detroit Receiving Hosp., Inc.*, 814 F.3d 769, 776 (6th Cir. 2016)).  Next, "the burden shifts to [Defendant] to articulate a legitimate, nondiscriminatory reason for their decision." *Smith*, 13 F.4th at 515.  Finally, "the burden then shifts back to [Plaintiff] to show that the reason the employer gave 'was not its true reason, but merely a pretext for discrimination.'" *Smith*, 13 F.4th at 515 (quoting *Jackson*, 814 F.3d at 776).

Plaintiff has established a prima facie showing of racial discrimination regarding her pay differential, and termination.[7]  It is undisputed that Plaintiff is a member of a protected class, as

---

[7]  Plaintiff does not address her alleged discriminatory treatment regarding scheduling and room assignments in her opposition to Defendant's summary judgment, although it is raised in the Complaint (ECF No. 1 at PageID #: 3).  ECF No. 38.  The Court therefore deems Plaintiff's claim of discriminatory treatment based on scheduling and room assignments abandoned.  *See Jones v. Ford Motor Co.*, No. 1:13CV2809, 2016 WL 1223212, at *4 (N.D. Ohio Mar. 29, 2016) (reasoning that "[a] claim may be deemed abandoned when a party asserts a

(1:20CV2734)

she is Black/African-American.  The parties also agree that Plaintiff was adequately qualified for

the position with Defendant, and that her employment with Defendant was terminated on July

31, 2020.  Finally, it is uncontested that there were similarly-situated individuals – Circulating

Nurses – outside of Plaintiff's protected class who were treated more favorably, and paid a

higher wage.

### B.  Legitimate, Non-discriminatory Reason

Given Plaintiff's establishment of a prima facie showing, the burden shifts to Defendant,

who successfully proffers a legitimate, non-discriminatory reason for Plaintiff's pay differential

and termination.

Beginning with the pay differential, four Circulating Nurses employed in the Lake West

Operating Room were outside of Plaintiff's protected class and were paid a lower wage than

Plaintiff at the time of Plaintiff's hire.[8]  Also, both at the time of Plaintiff's hire, and the time of

Plaintiff's termination from employment, some Circulating Nurses outside of Plaintiff's

protected class were paid a higher wage.  Those Circulating Nurses were paid a higher wage

because of non-discriminatory justifications, including, but not limited to, education, experience,

training, and internal seniority.  With respect to the nurses who were paid a higher wage at the

time of Plaintiff's hire, and outside of Plaintiff's protected class, Defendant has provided

claim in its complaint but fails to address the issue in response to a motion for summary judgment"); _Graham v. American Cyanamid Co._, 350 F.3d 496, 506 (6th Cir. 2003) (reasoning that plaintiffs had abandoned their fraud claim by failing to respond to the defendant's summary judgment motion on the claim).

[8]  The parties do not contest that Circulating Nurse 1, Circulating Nurse 2, Circulating Nurse 3, and Circulating Nurse 4 were each paid a lower wage at the time of Plaintiff's hire.

8

(1:20CV2734)

justifications.  Specifically, Defendant, through a Declaration from Craig Ghidotti, employed by

Defendant as the Vice President of Human Resources, states:

a) Circulating Nurse 5, who at the time of Nurse Manning's hire was paid only eleven cents per hour more than Nurse Manning, obtained her nursing license on September 9, 1983 (ten years prior to Nurse Manning) and had been employed by Lake Health in her current capacity since December 12, 2010. Circulating Nurse 5 therefore had significantly more experience and internal tenure/seniority than Nurse Manning. As noted above, employees with greater internal seniority generally earn more than newly-hired employees, insofar as they have the benefit of Lake Health's annual cost-of-living and/or merit salary increases.

b) Circulating Nurse 6, who at the time of Nurse Manning's hire was paid $35.67 per hour, was licensed as a Registered Nurse in the State of Ohio on March 19, 1987 and had been employed by Lake Health since October 2008. Thus, like Circulating Nurse 5, Circulating Nurse 6 had significantly more experience and internal tenure/seniority than Nurse Manning.

c) Circulating Nurse 8, who at the time of Nurse Manning's hire was paid $36.63 per hour, was licensed as a Registered Nurse in the State of Ohio on September 17, 1982 and had been employed at Lake Health since June 14, 1982. Circulating Nurse 8 therefore had much more experience and internal tenure/seniority than Nurse Manning.

d) Circulating Nurse 9, who at the time of Nurse Manning's hire was paid $36.91 per hour, was hired by Lake Health on November 7, 2003. Although Circulating Nurse 9 had less overall experience as a nurse, Circulating Nurse 9 had greater internal seniority/tenure than Nurse Manning. My review of Circulating Nurse 9's performance reviews also indicates that she received "Exceeds Expectations" performance ratings – and commensurate salary increases – in 2014, 2015, 2017, 2019, and 2020. Nurse Manning only earned a "Meets Expectations" rating at the time of her first (and only) annual performance review in November 2019.

e) Circulating Nurse 10, who at the time of Nurse Manning's hire earned $37.06 per hour, earned her Bachelor of Science degree in nursing in 1970 and has worked at Lake Health since April 22, 2007. Circulating Nurse 10 therefore had more experience and internal seniority/tenure than Nurse Manning.

f) Circulating Nurse 11, who at the time of Nurse Manning's hire was paid $37.27 per hour, was employed as both a Circulating Nurse and a Registered Nurse First Assist (RNFA). In addition to circulating, an RNFA functions in an expanded role as a surgical first assist. As such, the RNFA works in collaboration with the surgeon and other health care team members to achieve optimal patient outcomes and practices intraoperatively at the direction of the surgeon. Nurse Manning, by comparison, can only circulate and does not practice intraoperatively. Because Circulating Nurse 11

9

(1:20CV2734)

has a broader scope of practice, she was appropriately paid more than Nurse
Manning.

g) Circulating Nurse 12, who at the time of Nurse Manning's hire was paid $37.34 per
hour, was hired by Lake Health on August 19, 2002. In addition to circulating like
any other Circulating Nurse, Circulating Nurse 12 also "scrubs," meaning that she is
responsible for performing multiple tasks during an operation, including maintaining
sterility of the area around an operation and ensuring the sterility of the tools and
materials used during the procedure. As a Circulating Nurse, Nurse Manning does not
"scrub" and is not considered sterile during an operation or procedure. Rather,
Circulating Nurses like Nurse Manning assist the surgical team by providing
necessary help, materials, and equipment that cannot be accessed by the sterile
surgical team. The fact that Circulating Nurse 12 both circulates and scrubs justifies
her higher hourly rate. Circulating Nurse 12 also has a history of excellent
performance reviews, including "Exceeds Expectations" ratings in 2014, 2015, 2016,
2017, 2018, and 2019.

h) Circulating Nurse 13, who at the time of Nurse Manning's hire was paid $38.75 per
hour, was licensed as a Registered Nurse on September 17, 1982 and began working
for Lake Health on December 3, 2006. Circulating Nurse 13 therefore had
significantly greater nursing experience than Nurse Manning.

ECF No. 26 at PageID #: 371 – 373.

Similarly, Defendant has provided justification for each nurse outside of Plaintiff's

protected class who was paid a higher wage at the time of Plaintiff's termination.[9]  Defendant

states:

a) Circulating Nurse 14, who was paid $35.00 per hour at the time of Nurse
Manning's discharge, is a member of the operating room's Cardio Thoracic Team
and is able to both scrub and circulate in the operating room. As previously
discussed, Circulating Nurses with the ability to scrub have a wider skillset and
therefore demand higher compensation.

b) Circulating Nurse 15, who at the time of Nurse Manning's discharge was paid
$37.74 per hour, possesses the advanced Certified Perioperative Nurse (CNOR)
certification. This credential is defined as "the documented validation of the
professional achievement of identified standards of practice by an individual

---

[9]  Circulating Nurse 8, Circulating Nurse 10, Circulating Nurse 9, and Circulating
Nurse 12 were employed as Circulating Nurses at the time Plaintiff was hired and
terminated.  Defendant relies on those same justifications for the pay differentials
between Plaintiff and the other Circulating Nurses at the time of Plaintiff's termination.

10

(1:20CV2734)

registered nurse providing care for patients pre-, intra-, and post-surgery," and it is the only accredited certification for perioperative registered nurses in the country. Earning the CNOR is a mark of distinction among operating room nurses, and to my knowledge Circulating Nurse 15 was the only circulating nurse in Nurse Manning's department who possessed this advanced certification during Nurse Manning's tenure at Lake Health.

c) Circulating Nurse 16, who at the time of Nurse Manning's discharge was paid $38.99 per hour, has been a licensed Registered Nurse since September 7, 1990 and possess a Master of Science Degree in Nursing Administration from Regis University in Denver, Colorado. Based on Circulating Nurse 16's greater experience and higher level of education, she was appropriately paid more than Nurse Manning.

d) Circulating Nurse 17, who was paid $39.44 per hour at the time of Nurse Manning's discharge, joined Lake Health on September 3, 1996. Prior to serving as a Circulating Nurse in the Lake West Operating Room, Circulating Nurse 17 was employed by Lake Health as the Nurse Manager of Med/Surg at Lake West Medical Center. In that managerial role, Circulating Nurse 17 was paid at the rate of $43.59 per hour. In April 2019, Circulating Nurse 17 voluntarily transferred to the Lake West operating room as a circulating nurse. Accordingly, her rate of pay was decreased to $39.00 per hour. Although Circulating Nurse 17's pay was adjusted downward in light of decreased responsibilities, it was kept at the higher end of the pay scale for circulating nurses in recognition of her past managerial experience and tenure with Lake Health.

ECF No. 26 at PageID #: 374 – 375.  An employer is permitted to make business decisions based on neutral criteria (*e.g.*, experience, internal seniority, education levels, etc.).  *See Thomas v. Compuware Corp.*, 105 F. App'x 60, 63 (6th Cir. 2004) (using same evidentiary standard as the instant claims to reason that employer articulated a justifiable reason to promote one employee over another, citing the chosen employee's elevated skills, knowledge, and education; *Conti v. Universal Enterprises, Inc.*, 50 F. App'x 690, 695 (6th Cir. 2002) (holding that defendant employer "established a legitimate reason for the alleged pay differentials—individuals were paid based on their value to the corporation").  Accordingly, Plaintiff's reason for paying Plaintiff less than other similarly situated, non-protected employees is a legitimate, non-discriminatory reason.

11

(1:20CV2734)

Also, terminating an employee for violating a company policy has been consistently

recognized as a just reason for termination under the Title VII burden-shifting framework.

*Bilak-Thompson v. Dollar Tree Stores*, Inc., 293 F. App'x 380, 384 (6th Cir. 2008) (holding that

defendant "proffered a legitimate, non-discriminatory reason for [Plaintiff's] termination–

violating company policy"); *Howley v. Fed. Express Corp.*, 682 F. App'x 439, 446 (6th Cir.

2017) (stating that "[t]his Court has repeatedly held that violations of company policies …

are legitimate, non-discriminatory reasons for disciplining or discharging an employee"); *Russell

v. Lew*, 549 F. App'x 389, 394 (6th Cir. 2013) (holding that employer offered proper non-

discriminatory reasons for adverse employment actions because the actions were in accordance

with neutral agency policy).  Defendant has satisfied its burden with respect to the second prong

of the applicable burden-shifting framework.

### C. Pretext

Faced with Defendant's legitimate reasons for her termination, Plaintiff is unable to

satisfy the burden of establishing pretext.  "A plaintiff can establish pretext by demonstrating

that the defendant's proffered reason: '(1) has no basis in fact, (2) did not actually motivate the

defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct.'"

*Burks v. Yellow Transp., Inc.*, 258 F. App'x 867, 874 (6th Cir. 2008) (quoting *Dews v. A.B. Dick

Co.*, 231 F.3d 1016, 1021 (6th Cir. 2000)).  Plaintiff raises three grounds for a finding of pretext.

First, Plaintiff argues that Defendant's reason for terminating Plaintiff did not actually motivate

Plaintiff's termination because Defendant directed a co-worker to file a written complaint against

Plaintiff.  This method of proving pretext requires that the plaintiff "admit[ ] the factual basis

underlying the employer's proffered explanation and further admit[ ] that such conduct could

motivate dismissal."  *Chattman v. Toho Tenax Am., Inc.*, 686 F.3d 339, 349 (6th Cir. 2012)

(1:20CV2734)

(citing *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994)) (overruled on other grounds by *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 180 (2009)). Here, Plaintiff cannot show pretext under this basis because she directly challenges the factual basis of each of the three incidents underlying Defendant's reason for her termination and argues that none warrant her dismissal.  *See* ECF No. 38 at PageID #: 897 – 903.

Plaintiff also challenges the sufficiency of the reason for terminating Plaintiff because employees outside Plaintiff's protected class were not terminated for making racially divisive comments.  Plaintiff's argument here is also unpersuasive.  To begin, "disputes about the interpretation of company policy do not typically create genuine issues of material fact regarding whether a company's stated reason for an adverse employment action is only a pretext designed to mask unlawful discrimination."  *Sybrandt v. Home Depot, U.S.A., Inc.*, 560 F.3d 553, 558–59 (6th Cir. 2009).  All that is required is a showing that Defendant "'made a reasonably informed and considered decision before taking' the complained-of action."  *Michael v. Caterpillar Fin. Serv. Corp.*, 496 F.3d 584, 598–99 (6th Cir. 2007) (quoting *Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir. 1998)).

In the instant case, Defendant conducted an investigation following the first written complaint against Plaintiff raised by Byrne (ECF No. 30-2) by interviewing multiple employees and obtaining a written statement from Byrne.[10]  Similarly, Defendant received additional written complaints detailing the remaining two incidents (ECF Nos. 30-3, 30-4) which ultimately led to Plaintiff's termination.  Only after conducting an investigation by interviewing employees, and receiving multiple written complaints detailing three separate incidents did Defendant decide

---

[10]  The parties agree that this investigation occurred.  *See* ECF No. 31-1 at PageID #: 451, ECF No. 38 at PageID #: 900.

13

(1:20CV2734)

to terminate Plaintiff.  Based on the record, Defendant's decision is reasonable and well-considered.  *Caterpillar Fin. Servs. Corp.*, 496 F.3d at 599 (reasoning that pretext could not be established because the defendant employer interviewed employees with whom plaintiff worked and also employees who might have been witness to events leading to plaintiff's termination); *Deiters v. Brennan*, 620 F. App'x 413, 416 (6th Cir. 2015) (holding that defendant "made a reasonably informed and considered decision" by placing plaintiff on off-duty status because the evidence before the court included statements of managers and co-employees).

Finally, Plaintiff submits that Defendant's "legitimate, nondiscriminatory reason for paying [Plaintiff] less than her white peers is actually pretext." ECF No. 38 at PageID #: 907. Specifically, Plaintiff states:

a) She should be paid as much as Circulating Nurse 14 because Circulating Nurse 14 had less experience, less tenure, and a lower level of education than Plaintiff.

b) She should be paid more than Circulating Nurse 8 because Circulating Nurse 8 had a lower level of education, a less broad scope of practice, and performance reviews that were, at best, equal to Plaintiff.

c) She should be paid as much as Circulating Nurse 15 because Circulating Nurse 15 had less experience, less tenure, a less broad scope of practice, and performance reviews that were, at best, equal to Plaintiff.

d) She should be paid as much as Circulating Nurse 10 because Circulating Nurse 10 had the same level of education, a less broad scope of practice, and performance reviews that were, at best, equal to Plaintiff.

e) She should be paid as much as Circulating Nurse 9 because Circulating Nurse 9 had less experience, less education, and the same scope of practice as Plaintiff.

f) She should be paid as much as Circulating Nurse 12 because Circulating Nurse 12 had less experience, and less education than Plaintiff.

g) She should be paid as much as Circulating Nurse 16 because Circulating Nurse 16 had less tenure, a less broad scope of practice, and performance reviews that were, at best, equal to Plaintiff.

14

(1:20CV2734)

> h) She should have been paid as much as Circulating Nurse 17 because Circulating Nurse 17 had less education, a less broad scope of practice, and performance reviews that were, at best, equal to Plaintiff.

ECF No. 38 at PageID #: 905 – 907.  It is not within the Court's purview to substitute its business judgment for that of an employer.  *Hedrick v. W. Rsrv. Care Sys.*, 355 F.3d 444, 462 (6th Cir. 2004).  Plaintiff's "subjective view of her qualifications in relation to those of the other [Circulating Nurses], without more, cannot sustain a claim of discrimination." *Id.*  (citing *Johnson v. United States Dep't of Health and Human Servs.,* 30 F.3d 45, 47–48 (6th Cir. 1994)). *See e.g., Papierz v. Benteler Auto. Corp.*, No. 21-1237, 2022 WL 154342, at *2 (6th Cir. Jan. 18, 2022) (explaining that plaintiff's "disagreement" with defendant's weighing of qualifications "is insufficient to show pretext"); *Browning v. Dep't of Army*, 436 F.3d 692, 697 (6th Cir. 2006) (concluding that employer's decision to weigh particular evaluation criteria more heavily than others "is simply not sufficient to demonstrate pretext").

Because Plaintiff is unable to establish pretextual reasons for her pay differential or termination, Plaintiff's racial discrimination claims fail.

**B.  Prima Facie Retaliation**

"To establish a prima facie case of retaliation, a plaintiff must establish that he (1) 'engaged in a protected activity'; (2) his 'exercise of such protected activity was known by the defendant'; (3) the defendant subsequently 'took an action that was 'materially adverse' to the plaintiff'; and (4) 'a causal connection existed between the protected activity and the materially adverse action.'" *Briggs v. Univ. of Cincinnati*, 11 F.4th 498, 514 (6th Cir. 2021) (quoting *Rogers v. Henry Ford Health Sys.*, 897 F.3d 763, 775 (6th Cir. 2018)).  "Once a plaintiff makes [] a prima facie case, the defendant bears the burden of articulating a legitimate, non-retaliatory reason for its action, supported by admissible evidence." *Briggs*, 11 F.4th at 515

15

(1:20CV2734)

(citing *Rogers*, 897 F.3d at 777).  "If the defendant does so, the burden shifts to the plaintiff to demonstrate that the proffered reason is 'actually a pretext to hide unlawful retaliation.'" *Briggs*, 11 F.4th at 515  (quoting *Rogers*, 897 F.3d at 777).  "At the summary judgment stage, a plaintiff meets this burden when he 'produce[s] evidence sufficient that a reasonable finder of fact could reject the employer's proffered reason.'" *Briggs*, 11 F.4th at 515  (quoting *Rogers*, 897 F.3d at 777).

The parties agree that the first three elements are established.[11] Defendants are entitled to summary judgment on Plaintiff's retaliation claim because Plaintiff fails to establish a causal connection between her protected activity, speaking with a supervisor about wages, and her subsequent termination.  Plaintiff seeks to satisfy the fourth element by directing the Court to the proximity in time of Plaintiff raising wage concerns with her supervisor and being terminated. The Sixth Circuit has held that temporal proximity, standing alone, is "insufficient to establish an inference of retaliation when there is a significant period of time between the protected activity and the adverse action and there are other explanations for the adverse action." *Mulvin v. City of Sandusky*, 320 F. Supp. 2d 627, 635 (N.D. Ohio 2004) (citing *Parks v. City of Chattanooga*, 74 Fed. Appx. 432, 438 (6th Cir. 2003)).  While an approximate one-month period between protected activity and an adverse employment action has been found to create an inference of retaliation,[12] an  "intervening cause between protected activity and an adverse employment

---

[11]  It is uncontested that, on June 25, 2020, Plaintiff had a discussion with Kovacic-Mauer in which Plaintiff complained that she was being paid less than white nurses because of her race, and Plaintiff was terminated on July 31, 2020.  ECF No. 30 at PageID #: 415.

[12]  *See, e.g.*, *Herrera v. Churchill McGee, LLC*, 545 F. App'x 499 (6th Cir. 2013) (holding termination one month after employee complaint created inference of causation); *Davison v. Roadway Exp., Inc.*, 562 F. Supp. 2d 971, 983 (N.D. Ohio 2008)

16

(1:20CV2734)

action dispels any inference of causation." *Kenney v. Aspen Techs., Inc.*, 965 F.3d 443, 450 (6th Cir. 2020). The Sixth Circuit has recognized that conduct which gives an employer a legitimate reason to discipline or terminate an employee qualifies as an intervening cause. *See* e.g., *Lisan v. Wilkie*, 835 F. App'x 831, 836 (6th Cir. 2020); *Jones v. Vilsack*, 861 F. App'x 58, 61 (6th Cir. 2021); *Kuhn v. Washtenaw Cty.*, 709 F.3d 612, 628 (6th Cir. 2013). In this case, three events occurred that gave rise to Plaintiff's termination. Because Plaintiff violated Defendant's policy of zero-tolerance in the intermediate time between her protected conduct and termination, intervening events arose, thus disposing of the inference of retaliation. *See Wingo v. Michigan Bell Tel. Co.*, 815 F. App'x 43, 47 (6th Cir. 2020) (recognizing violation of employer policy as an intervening event between plaintiff protected activity and adverse employment action); *Wright v. Cellular Sales Mgmt. Grp., LLC*, 793 F. App'x 409, 411 (6th Cir. 2019) (same).

Accordingly, Plaintiff fails to establish a prima facie showing of retaliation.

**2. Legitimate, Non-discriminatory Reason**

Assuming that Plaintiff were able to make a prima facie showing of retaliation, Defendant has offered a permissible reason for termination – Plaintiff's violation of Defendant's zero-tolerance policy. The Court accepts this reason and both relies on, and incorporates, its earlier analysis given under Plaintiff's racial discrimination claims.

---

(stating that five weeks between protected conduct and adverse employment action "gives rise to an inference of causality").

17

(1:20CV2734)

### 3. Pretext

Plaintiff's retaliation claim also fails because she is unable to establish pretextual reasons for her termination. The Court both relies on, and incorporates, its earlier analysis rejecting Plaintiff's arguments of pretext made above, under Plaintiff's racial discrimination claims.

Accordingly, Plaintiff's retaliation claim fails.

### III. Conclusion

For the reasons stated above, summary judgment is granted in favor of Defendant. A separate judgment entry will issue.

IT IS SO ORDERED.

February 9, 2022                                             /s/ Benita Y. Pearson
Date                                                                   Benita Y. Pearson
                                                                          United States District Judge